UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TERESA WALKER,

        Plaintiff,

    v.

NANCY A. BERRYHILL,

        Defendant.

Case No. 17-cv-04365-DMR

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 20, 21

        Plaintiff Teresa Walker moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found that she was not disabled and therefore denied her application for benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*. The Commissioner cross-moves to affirm. For the reasons stated below, the court grants in parts and denies in part Walker's motion and the Commissioner's cross-motion, and remands for further proceedings consistent with this decision.

## I.    PROCEDURAL HISTORY

        Walker is currently 55 years old. She lives in subsidized housing in the City of Berkeley and was previously homeless and living on the streets for approximately 7 years. She has a history of depression and auditory hallucinations, along with a history of alcohol and cocaine use.

        On December 28, 2009, Walker filed an application for Supplemental Social Security income ("SSI") alleging disability starting on January 1, 2006 due to various physical and mental conditions including depressive disorder, asthma, low back pain, and a right hand finger injury. Administrative Record ("AR") 117. On October 24, 2011, ALJ Mary P. Parnow found that Walker had severe impairments including, but not limited to, polysubstance dependence, but determined that she was not disabled. AR 114-29. In so finding, ALJ Parnow concluded that Walker would not be disabled if she stopped using substances (alcohol, tobacco, cocaine,

marijuana, and prescription narcotics), and that her substance use was material to the disability determination. AR 129. Since Walker did not appeal the October 2011 decision, it is a final determination regarding her disability through the date of that decision.

On August 29, 2012, Walker filed another application for SSI income alleging disability due to asthma, fibromyalgia, back pain, depression, and anxiety starting on June 29, 2012. AR 335-57. Her application was initially denied on January 23, 2013 and again on reconsideration on August 16, 2013. AR 135-47 (Denial), 148-68 (Reconsideration). On September 11, 2013, she filed a request for a hearing before an Administrative Law Judge (ALJ). AR 182-84. ALJ Richard P. Laverdure held hearings on June 8, 2015 and September 16, 2015 during which Walker appeared and testified, along with vocational expert (VE) Joel Greenberg and medical expert (ME) Ann Monis. AR 75-85 (June hearing); 36-74 (September hearing).

On November 24, 2015, ALJ Laverdure issued a decision finding that Walker was not disabled. AR 13-30. Walker appealed Laverdure's decision to the Appeals Council. AR 1.

On June 4, 2017, the Appeals Council denied Walker's request for review. AR 1-6. The ALJ's decision therefore became the Commissioner's final decision. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011). Walker then filed suit in this court pursuant to 42 U.S.C. § 405(g). Because Walker did not appeal the 2011 ALJ decision, the November 2015 decision is the only ALJ decision at issue in this appeal.

## II.     LEGAL STANDARDS

### A.     Standard of Review

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a mere scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted).

When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

**B.      The Five-Step Sequential Evaluation Process**

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[1] and that is expected to result in death or to last for a continuous period of at least twelve months. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

1.      At the first step, the ALJ considers the claimant's work activity, if any. If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2.      At the second step, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

---

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

3.      At the third step, the ALJ also considers the medical severity of the claimant's impairment(s).  If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4.      At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work.  If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5.      At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work.  If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

**C.      Drug Addiction and Alcoholism ("DAA")**

When the record demonstrates that substance abuse has occurred in conjunction with an alleged disability, the ALJ may not find a claimant disabled "if alcoholism or drug addiction would . . . be a contributing factor material to the . . . determination that the individual is disabled."  42 U.S.C. § 1382c(a)(3)(J); *see* 20 C.F.R. § 416.935(a) & (b).  In determining whether a claimant's DAA is material, the test is whether the individual would still be found disabled if he or she stopped using drugs or alcohol.  *See* 20 C.F.R. §§ 404.1535(b), 416.935(b); *Parra v. Astrue,* 481 F.3d 742, 746-47 (9th Cir. 2007); *Sousa v. Callahan,* 143 F.3d 1240, 1245 (9th Cir. 1998). The ALJ must "evaluate which of [the claimant's] current physical and mental limitations . . . would remain if [the claimant] stopped using drugs or alcohol and then determine whether any or all of [the claimant's] remaining limitations would be disabling."  20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2).  If the ALJ determines that the claimant's remaining limitations are disabling, then the claimant's DAA is not a material contributing factor to the determination of disability, and the claimant is disabled, independent of his or her DAA.  *See* 20 C.F.R. §§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii).  The claimant has the burden of showing that he or she would qualify as

4

disabled absent DAA.  *See Parra*, 481 F.3d at 748.

Social Security Ruling ("SSR") 13-2p sets forth the procedure for evaluating cases involving DAA, which the ruling defines as "Substance Use Disorders; that is, Substance Dependence or Substance Abuse as defined in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) published by the American Psychiatric Association."  SSR 13-2p, 2013 WL 621536, at *3.  It instructs adjudicators to "apply the appropriate sequential evaluation process twice.  First, apply the sequential process to show how the claimant is disabled.  Then, apply the sequential evaluation process a second time to document materiality[.]"  *Id*. at *6.  Although SSRs do not have the force of law, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations."  *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

SSR 13–2p(7) provides that where a claimant has co-occurring mental disorder(s), there must be "evidence in the case record that establishes that [the] claimant . . . would not be disabled in the absence of DAA" to support a DAA materiality determination.  SSR 13–2p(7), 2013 WL 621536, at *9.  The ALJ may not "rely exclusively on medical expertise and the nature of a claimant's mental disorder" to support a finding of DAA materiality.  *Id*.  Furthermore, DAA is not material "if the record is fully developed and the evidence does not establish that the claimant's co-occurring mental disorder(s) would improve to the point of nondisability in the absence of DAA."  *Id*.  Also, "[i]f the evidence in the case record does not demonstrate the separate effects of the treatment for DAA and for the co-occurring mental disorders," then the ALJ should find that the DAA is not material.  *Id*. at *12.

SSR 13–2p(9) provides that the ALJ may consider periods of abstinence[2] as evidence of DAA materiality in cases involving co-occurring mental disorders, so long as the "claimant is abstinent long enough to allow the acute effects of drugs or alcohol abuse to abate."  SSR 13–

---

[2] The term "period of abstinence" refers to "a period in which a claimant who has, or had, been dependent upon or abusing drugs or alcohol and stopped their use."  SSR 13–2p, 2013 WL 621536, at *8 n.17.

5

2p(9), 2013 WL 621536, at *12. In considering periods of abstinence with co-occurring mental disorders, "the documentation of a period of abstinence should provide information about what, if any, medical findings and impairment-related limitations remained after the acute effects of drug and alcohol use abated." *Id*. The ALJ may "draw inferences from such information based on the length of the period(s), how recently the period(s) occurred, and whether the severity of the co-occurring impairment(s) increased after the period(s) of abstinence ended." *Id*.

## III.    FACTUAL BACKGROUND

### A.    Walker's Testimony

At the June and September 2015 hearings, Walker testified as follows: She has not worked for the last 15 years because she finds that it is difficult to stay focused. AR 58, 82. At one point in her work history, she worked at Emporium Capwell in sales. AR 64. She graduated from high school, but did not attend college. AR 64-65. She lives in subsidized housing in Berkeley, and supports herself through general assistance. AR 58. She attends biweekly AA meetings and weekly meetings at Friendly Manor, an outpatient rehabilitation facility for women. AR 59, 83. When Walker leaves her apartment for these meetings, she is gone for no more than 1 hour. AR 63. Regarding substance use, Walker testified that she no longer uses alcohol or cocaine. AR 60. The last time she used any street drugs including marijuana was over 2 years ago. AR 83. The last time she ingested alcohol (had a beer) was over 1-2 years ago. *Id*. In response to the ALJ's statement that the medical records show that she admitted to using cocaine at a party a year ago, and to drinking alcohol, Walker stated that she "[did not] remember that at all." AR 61. She also testified to having memory problems, and finds it hard to remember what she did on certain days, and sometimes forgets what day it is. *Id*. She takes Risperdal because she hears voices at night. *Id*. On an average day, she lies down after taking her medications, watches television, and cooks meals for herself. AR 62.

### B.    Relevant Medical Evidence

Since Walker's substance use and mental health are at issue in this appeal, the court summarizes the medical evidence relevant to those issues in chronological order.

### 1. Lifelong Medical Care - February 2012 through July 8, 2012[3]

Walker was treated at the Lifelong clinics for physical and mental health issues from August 2010 through September 2014. Since the October 2011 ALJ decision is a final decision on the issue of disability through the date of the decision (October 26, 2011), the court will summarize the mental health records for the time period of 2012 onward.

Walker was treated for mental health issues at Lifelong from February 15, 2012 to July 8, 2012 by psychiatrist Lester Love, M.D. and nurse practitioner Sonia Reyes.

At the February 15, 2012 visit, Walker came to the clinic for a refill on her medications. AR 532. The February 2012 progress note lists 6 medications: Risperdal, Prozac, Buspar, ProAir HFA, Qvar, and Nexium. *Id.* At this visit, Walker stated that her overall mood was okay, her appetite was good, and Risperdal was helpful in "making the voices less loud." *Id.* However, she complained of increased fatigue in the morning and being unable to attend AA/NA meetings as a result. *Id.* She denied cocaine use, but admitted to having a can of beer twice a week. *Id.* Upon a mental status examination, she presented as casually dressed; euthymic in mood; reactive in affect; congruent in mood ("better"), and within normal limits for cognitive function (memory/concentration) and movements (gait, facial, and extremities). *Id.* Either Love or Reyes observed that Walker's mood, appetite, and sleep had improved; the auditory hallucinations had lessened; and her fatigue was likely attributable to the lower Prozac dosage. *Id.* The treatment plan was for Walker to start taking Prozac as prescribed in the morning; to refill all of her medications at the clinic; and to follow up with the nurse practitioner in 3 weeks for medication refills. AR 533. The progress notes indicate that Walker agreed to come into the clinic for weekly urine tox screens and scheduled a screen for the following week. *Id.*

On April 30, 2012, Walker presented to the clinic complaining of frustration with appointment scheduling and seeking pain medication because she experienced pain all over her

---

[3] In order to understand the arc of the medical evidence, including her reported history of substance use, the court will summarize her treatment at Lifelong in chronological order interspersed with her treatment with the other providers. Accordingly, there are four subsections discussing her treatment at Lifelong, i.e., one section discussing the 2012 treatment; the second section discussing the late 2012 - early 2013 treatment; the third section discussing the late 2013; and the fourth section discussing the late 2013 to 2014 treatment.

body. AR 528. She indicated that she still heard voices, but that they were more distant. *Id*. Regarding substance use, she stated that she drank a 32 ounce beer twice a week. *Id*. Upon a mental status examination, she presented as casually dressed; irritable in mood; labile in affect; hearing distant auditory hallucinations, but denying any visual hallucinations; and within normal limits for cognitive function (memory/concentration) and movements (gait, facial, and extremities). *Id*. Either Love or Reyes observed that Walker was compliant with her medications except Prozac due to her need for a refill; that her auditory hallucinations decreased and she was able to turn away from the voices; and she was in a frustrated mood recently due to psychosocial stressors (SSI, medical benefits, multiple providers and appointments). AR 529. The plan was to refill her Prozac prescription and continue her on Risperdal, and to have a follow-up appointment in 3 months on depression and auditory hallucinations. *Id*.

On July 18, 2012, Walker reported to the clinic complaining that she felt "a little under the weather." AR 526. She stated that she was depressed, had crying spells, and had multiple stressors relating to her SSI, and needed a refill on her medications. *Id*. She indicated that she heard voices, but that they were distant and did not bother her. *Id*. Regarding substance use, the progress notes indicated that Walker had a history of cocaine and alcohol dependence, but that, at this visit, she denied any current use of either. *Id*. Upon a mental status examination, she presented as casually dressed; depressed in mood; constricted in affect; hearing distant auditory hallucinations, but denying any visual hallucinations; intact cognitive function (memory/concentration); and within normal limits for movements (gait, facial, and extremities). AR 527. The plan was to continue Walker on her medications. *Id*.

### 2. Consulting Examining Psychologist, Katherine Wiebe, Ph.D. - July 29, 2012

Katherine Wiebe, Ph.D. saw Walker for a 3 hour consultative psychological evaluation on July 29, 2012 to assess her cognitive and emotional functioning. AR 486-501. At the exam, Walker reported that she took medications for various physical ailments including fibromyalgia, asthma, acid reflux, lower back pain, and body aches, and took psychotropic medications including Prozac (depression) and Risperdal (anti-psychotic). AR 488. She also stated that she

8

1  was living in an apartment in Berkeley obtained with assistance from Lifelong, but had previously

2  been homeless and living on the streets for approximately 7 years.  AR 487.

3      Wiebe obtained a full background from Walker including family and social history;

4  academic, employment, and legal history; medical history and medications; psychiatric history;

5  prior testing; and substance abuse history.  Relevant to the issues in this appeal are the substance

6  abuse and psychiatric history.  Regarding the substance abuse history, Walker reported using

7  marijuana a few times a month on occasion, having a glass or two of beer about every other day,

8  and having a glass of wine two days ago.  AR 488.  She last reported using cocaine approximately

9  3 months ago and prior to that time, had last used cocaine 2 months before.  *Id*.  Wiebe noted that

10  Walker had continuing and severe psychiatric and personality disorder symptoms, and that her

11  "reported use of substances would not account for the severe ongoing symptoms she [was]

12  experiencing, which [were] unlikely to abate soon regardless of her being clean."  *Id*.  Regarding

13  the psychiatric history, Walker reported symptoms of depression, anxiety, and frequent auditory

14  hallucinations.  AR 488.  She indicated that she had been taking psychotropic medications for

15  approximately 1 year, including Prozac for depression and Risperdal, an anti-psychotic

16  medication, prescribed by Love.  AR 488.  She also reported that she was in psychotherapy

17  treatment with Maria Culcasi for over a year and that it helped a great deal.  *Id*.

18      Upon a functional and mental status examination, Wiebe observed that Walker evidenced

19  symptoms of severe depression and anxiety, and "was internally distracted at times."  AR 488.

20  She noted that Walker seldom left the home due to anxiety, depression, and paranoid symptoms,

21  and was socially isolated.  *Id*.  Wiebe also noted that Walker was casually dressed, well-groomed,

22  and cooperative with the assessment, evincing conscientious and adequate effort during testing.

23  AR 489.  However, she noticed that Walker often appeared dissociative and internally distracted;

24  Walker affirmed that she was being internally distracted by the voices in her head during the

25  assessment.  *Id*.  Wiebe indicated that although Walker was basically oriented to person, time, and

26  place, that she had "impaired reasoning, insight, and judgment due to the severity of her

27  psychiatric symptoms."  *Id*.

28      As part of the assessment, Wiebe conducted a series of psychological tests, the results of

9

which she incorporated into her conclusions. AR 489-95. Based on the clinical examination, and psychological testing, Wiebe diagnosed Walker with Axis I[4]: 295.70 - Schizoaffective Disorder, Depressive Type, 300.02 - Generalized Anxiety Disorder; Axis II: 301.001 - Paranoid Personality Disorder, 301.90 - Negativistic (Passive-Aggressive) Personality Disorder with Schizoid Personality Traits and Avoidant Personality Traits; Axis III: Defer to physician; Axis IV: Jobless, financial problems, difficulties accessing medical and psychiatric treatment, difficulties with social support, and Axis V: GAF score: 41.[5] AR 497. Based on the results of the assessment testing, she opined that Walker had severe impairments in memory functioning; moderate to severe impairments in attention/concentration/persistence; moderate impairment in executive, language, and visual/spatial functioning; and showed mild impairments in sensory-motor functioning. AR 496. She also found Walker to be a "fairly reliable historian and source of information" given the

---

[4] "There are five axes in the DSM diagnostic system, each relating to a different aspect of a mental disorder:

Axis I: This is the top-level diagnosis that usually represents the acute symptoms that need treatment; Axis I diagnoses are the most familiar and widely recognized (e.g., major depressive episode, schizophrenic episode, panic attack). Axis I terms are classified according to V-codes by the medical industry (primarily for billing and insurance purposes).

Axis II: This is the assessment of personality disorders and intellectual disabilities. These disorders are usually life-long problems that first arise in childhood.

Axis III: This is the listing of medical and neurological conditions that may influence a psychiatric problem. For example, diabetes might cause extreme fatigue, which may lead to a depressive episode.

Axis IV: This section identifies recent psychosocial stressors—the death of a loved one, divorce, loss of a job, etc.—that may affect the diagnosis, treatment, and prognosis of mental disorders.

Axis V: This section identifies the patient's level of function on a scale of 0–100, where 100 is the highest level of functioning. Known as the Global Assessment of Functioning ("GAF") Scale, it attempts to quantify a patient's ability to function in daily life."

*Cantu v. Colvin*, No. 5:13-CV-01621-RMW, 2015 WL 1062101, at *6 (N.D. Cal. Mar. 10, 2015); *see also* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000) ("DSM–IV") at 27-34. The court cites to the DSM-IV because it was in place at the time the relevant medical records were created. It has been replaced by the DSM-5, which eliminated the multiaxial system of diagnosis.

[5] A GAF score of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 34.

depth of sensitive information she shared about her life, and the testing results. AR 496-97.

Wiebe further opined that Walker's psychiatric symptoms interfered with her cognitive

functioning and ability to make decisions, resolve problems, and effectively manage her daily

affairs, and her social isolation would affect her ability to relate effectively to supervisors, co-

workers, and the public in a work environment. AR 497. She also opined that due to the severity

of her psychiatric symptoms, Walker would be unable to sustain simple or complex tasks on a full

time basis. *Id*.

In connection with this assessment, Wiebe rated Walker's mental ability and aptitude to

perform unskilled work. AR 501. She indicated that Walker had no useful ability to perform 5

work-related activities including maintaining attention and concentration for 2 hour segments;

performing at a consistent pace without an unreasonable number and length of rest periods;

responding appropriately to changes in a routine work setting and dealing with normal work

stressors; completing a normal workday and workweek without interruptions from psychologically

based symptoms; and maintaining regular attendance and being punctual. *Id*.

### 3. Lifelong Medical Care - December 2012 through April 2013

On December 20, 2012, Walker complained of feeling very withdrawn and depressed as a

result of the death of her brother, mother, and father. AR 525. Her medications were refilled at

this appointment. *Id*.

She was next seen on March 4, 2013 by Jabari Jones, M.D. for depression. AR 523. At

this visit, she presented as tearful at times when discussing stressors, and reported a depressed

mood, decreased energy, and social isolation. *Id*. She also reported having auditory

hallucinations, but that these hallucinations were not as loud as when she did not take her

medications. *Id*. She noted that the hallucinations talked about her sometimes and said bad things

about her. *Id*. She denied using any substances, but admitted to drinking 1 can of beer a week.

*Id*. She indicated that her mood improved with a higher dosage of Prozac and was participating in

weekly therapy sessions with Maria Culcasi. *Id*. Upon a mental status examination, Jones

observed that Walker was exhibiting signs of psychosis, had auditory hallucinations, and a

depressed mood, but otherwise exhibited normal findings. *Id*. Jones diagnosed Walker with Axis

I: Major Depression, Recurrent (296.30) with psychotic features, Cocaine Dependent, Unspecified (304.20) in remission, Alcohol Dependence (303.90) in remission; Axis IV: Moderate and problems relating to primary support group and social environment; and Axis V: GAF score of 48. Jones's plan was, among things, to increase Walker's Prozac prescription to target "breakthrough depression" and to continue her on Risperdal as maintenance for her psychotic symptoms. AR 523.

On April 1, 2013, Walker presented for a follow-up visit with Jones. AR 522. She reported that her mood was "pretty good"/euthymic, and had decreased anxiety and depression. *Id.* However, she had a depressed affect and was tearful when discussing stressors. *Id.* She also reported having auditory hallucinations, but that the voices were not as loud and were further away as compared with the last visit. *Id.* Upon a mental status examination, Jones observed otherwise normal findings except for the auditory hallucinations, mood, and affect as discussed above. *Id.* He diagnosed her with Axis I: Schizoaffective Disorder, Cocaine Dependence in remission, Alcohol Dependence in remission; Axis IV; and Axis V: GAF score of 43. Jones continued Walker on Prozac and Risperdal. AR 522.

### 4. Consulting Examining Psychologist, Sherry L. Lebeck, Ph.D. - July 2013

On July 12, 2013, Lebeck conducted a psychological evaluation to assess Walker's cognitive and emotional functioning in connection with SSI eligibility. AR 560-70. Lebeck described Walker as a then-50 year African-American single female with two grown adult children. AR 567. She noted that Walker's extensive history of "schizophrenia, depression, anxiety, aggression, interpersonal difficulties and homelessness" qualified her for supportive housing through the City of Berkeley. *Id.* She indicated that Walker currently resided in a supportive housing unit in Berkeley where she also received case management support; attended a day rehabilitation program twice a week to address mental health and substance abuse needs; saw an outpatient therapist once a week; and received psychotropic medication services through Berkeley Mental Health and Lifelong clinics. *Id.*

Upon a mental status examination, Walker was well-groomed and on time for the

appointment, but was visibly anxious, almost panicked, had a tearful affect, gasping breaths, and occasional stuttering at the beginning of the appointment. AR 560-61. She became less anxious throughout the appointment, but was tearful on and off throughout the interview. AR 561. Lebeck also observed that Walker's mental status "appeared to be in the average range for her age and level of education." *Id*.

Lebeck obtained a full background from Walker including psychosocial history, educational/vocational history, psychiatric history, substance abuse history, medical history, and legal history. AR 561-63. Relevant to the issue in this appeal are the psychiatric and substance abuse histories. Regarding the substance use history, Walker reported a 10-12 year history of daily cocaine and alcohol use beginning after the birth of her children, and indicated that she quit using cocaine approximately 4-5 years ago and occasionally drank a beer. AR 563. Regarding the psychiatric history, Walker reported feelings of depression, hearing voices, and explosive anger and rage. AR 562. She indicated that she had taken Prozac for the past two years, which was some help. *Id*. She affirmed that she continued to hear voices, but the voices were not as loud as they were in the past since she started taking Risperdal. *Id*. The voices were of people she knew, came from the walls, and looked at her while saying negative things to her. *Id*. In order to avoid hearing the voices, Walker looked away from the wall and increased the volume on the television. *Id*. She denied any visual hallucinations. *Id*. Regarding anger and rage, Walker reported several instances where she became overwhelmed with rage and physically assaulted people including family and strangers. AR 562, 564. In order to manage her hostile impulses, she tended to isolate herself and stay in her room, which reduced her aggression and physical assaults, but increased her depressive and anxious symptoms. AR 563.

In addition to the clinical interview, Lebeck administered 8 psychological tests, AR 564-66, the results of which she incorporated into the clinical findings. AR 567.

Based on the clinical interview, the results of psychological testing, and a review of the medical records, Lebeck diagnosed Walker as having the following disorders: Axis I: 295.30 - Schizophrenia, Paranoid Type, 300.02 - Generalized Anxiety Disorder, 296.20 - Major Depressive Disorder, Single Episode, Unspecified, 303.90 - Alcohol Dependence, Early Partial Remission,

and 305.60 - Cocaine Abuse, Early Full Remission. AR 567; Axis II: 799.9 - Deferred; Axis III: Fibromyalgia (Per report); Axis IV: Inadequate finances, unemployed, no health insurance, inadequate social support, difficulties with access to medical treatment, chronic pain; and Axis V: GAF = 37.[6] AR 567. Lebeck observed that Walker's presentation in the interview and assessment was "consistent with her history, self-report, and the results of the testing," and that she was unable to "substantially reduce or control her symptoms" even with individual therapy, a day rehabilitation program, psychiatric medication, and supported living. AR 568. Accordingly, Lebeck opined that Walker's "psychiatric diagnoses [were] permanent conditions that [had] occurred for more than 36 months and [were] unlikely to change," and that she "[was], and [would] likely continue to be, unable to seek and maintain sustainable employment due to the chronic and severe nature of the symptoms she exhibit[ed]." *Id.* She found that Walker met the criteria of an individual with severe and persistent psychological conditions and should be eligible for SSI benefits. *Id.*

In connection with the examination, Lebeck rated Walker's mental ability and aptitude to perform unskilled work and particular types of jobs. AR 569-70. Regarding the mental ability and aptitude to perform unskilled work, Lebeck indicated that Walker had no useful ability to function, which was the most severe limitation, in 7 out of 15 work-related activities including maintaining regular attendance and punctuality; complete a normal workday and workweek without interruptions from psychologically based symptoms; performing work at a consistent pace without an unreasonable number and length of rest periods; getting along with co-workers or peers; accepting instructions and responding appropriately to criticism from supervisors; and dealing with normal work stress. AR 569-70. Regarding the mental ability and aptitude to perform particular types of jobs, Lebeck indicated that Walker had no useful ability to function in 3 out of 5 work-related activities including interacting appropriately with the general public;

---

[6] A GAF score of 31 to 40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant), or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). DSM–IV at 34.

maintaining socially appropriate behavior; and traveling in unfamiliar places. AR 570. Regarding the effect of Walker's impairments on her ability to work, Lebeck opined that Walker would likely be absent from work more than 4 days per month due to her impairments. *Id*. She further opined that her impairments remained as severe in the absence of substance use, and noted that Walker was not currently abusing or dependent upon substances and that although Walker drank "occasionally," she sustained sobriety and her psychotic symptoms persisted. *Id*.

### 5. State Agency Non-Examining Consultant, R. Lee, M.D. - August 2013

On August 15, 2013, Lee reviewed Walker's medical records and completed a Mental Residual Functional Capacity Assessment ("MRFCA"). AR 163-65. According to Lee, Walker was not significantly limited in her ability to remember locations and work-like procedures; to understand and remember very short and simple instructions; and to understand and remember detailed instructions. AR 164. Regarding sustained concentration and persistence limitations, Lee indicated that Walker could sustain concentration and persistence limitations for simple tasks. AR 164 (noting that Walker was moderately limited in 4 categories rating an individual's ability to sustain concentration and persistence in a task). Regarding social interaction limitations, Lee observed that Walker had social interaction limitations and should have limited public/peer/supervisor contact. AR 164-65 (noting that Walker was moderately limited in 4 categories rating an individual's social interaction abilities). Regarding adaptation limitations, Lee opined that Walker could adapt to changes in routine work settings. AR 165 (noting that Walker was moderately limited in 2 categories rating an individual's adaptation abilities).

In support of the MRFCA, Lee reproduced verbatim the assessment of a medical records review upon reconsideration performed by Jalega (DEA III), who partially adopted the ALJ's October 2011 determination that drug addiction and alcoholism (DAA) was material and opined that Walker was able to do simple and complex tasks in the absence of DAA. AR 165; *see also* AR 157 (Lee concurring with Jalega's assessment). According to Jalega, Walker did not allege any worsening or new impairments, and recent exams noted that Walker had remained in remission from cocaine and alcohol; was compliant with medications; and had noted improvement in mood and decreased in auditory hallucinations. *Id*. Jalega noted that while the medical records

indicated that Walker did appear tearful when discussing stressors, the record also indicated that Walker stated that her mood was pretty good. AR 165. Accordingly, Jalega observed that Walker had improved and would "likely continue to improve should she refrain from cocaine/ETOH and follow" treatment. *Id*. Based on medical records when Walker was under the influence, Jalega opined that it appeared that DAA was material and that without DAA, she was "likely capable of simple tasks w/limited public contact." *Id*.

### 6. Lifelong -September 26, 2013 Visit

On September 26, 2013, Walker saw nurse practitioner Douglas M. Frey for various physical and mental conditions including schizophrenia/bipolar disorder and a history of cocaine use. AR 604. Regarding schizophrenia/bipolar disorder, Walker indicated that she wanted to get a refill on her psychiatric medications because the voices were getting louder. *Id*. Regarding cocaine history, she reported that she was no longer using cocaine, stating: "It's been over three years since I've done that. I live in Berkeley now so I no longer indulge." *Id*. Upon a physical examination, Frey observed that although she was oriented to time, place, person and situation, she had an inappropriate mood and affect. *Id*. In his assessment/plan, he noted that although she denied using cocaine for over 3 years, her July 2012 tox screen had been positive for cocaine, and that he suspected continued cocaine use. *Id*. Frey ordered a tox screen for Walker to complete that day, but Walker left the clinic prior to giving a urine sample. *Id*. As for schizophrenia and bipolar disorder, Frey scheduled Walker for an appointment at Sausal Creek to re-establish care, but Walker left before getting directions to Sausal Creek. *Id*.

### 7. Treating Social Worker, Ann Sussman, LCSW - October 15, 2013

Sussman, a Licensed Clinical Social Worker, saw Walker on a weekly basis from July 2013 through April 2015. AR 582-87.

On October 15, 2013, Sussman completed a MRFC questionnaire in which she diagnosed Walker with Major Depressive Disorder (Axis I: 296.30) and Alcohol Dependence in Remission (Axis II: 303.93). AR 582. Sussman indicated that she treated Walker with talk therapy and medications, but that Walker continued to be depressed and without motivation to leave her house. *Id*. She observed that Walker was well-groomed and superficially friendly; did not leave her room

16

unless absolutely necessary; and spent most of her day watching television and sleeping. AR 582.

As part of the MFRC, Sussman rated Walker's mental ability and aptitude to perform unskilled work, semiskilled or skilled work, and particular types of jobs. AR 584-85. Regarding her mental ability and aptitude to perform unskilled work, Sussman indicated that Walker was unable to meet competitive standards/could not satisfactorily perform 9 out of 16 work-related activities including, but not limited to, such activities as maintaining attention for a two-hour segment, regular attendance and being punctual; performing at a consistent pace without an unreasonable number and length of rest periods; getting along with co-workers or peers, and responding appropriately to changes in a routine work setting. AR 584. Regarding her mental ability and aptitude to perform semiskilled or skilled work, Sussman indicated that Walker was unable to meet competitive standards in all 4 work-related activities including understanding and remembering detailed instructions; carrying out detailed instructions; setting realistic goals or making plans independently of others; and dealing with the stress of semiskilled and skilled work. AR 585. Regarding her mental ability and aptitude to perform certain types of jobs, Sussman rated Walker as unable to meet competitive standards in 3 out of 5 work-related activities including maintaining socially appropriate behavior; traveling in unfamiliar places; and using public transportation. AR 585. Sussman opined that Walker would likely be absent more than 4 days per month due to her impairments. *Id.* She further opined that Walker was not a malingerer and that her impairments would remain as severe in the absence of substance use, noting that Walker was depressed even when she was sober, and she had always been sober at their meetings, but emotionally labile, and cried a lot. *Id.*

### 8. Lifelong - October 17, 2013 - September 2, 2014

On October 17, 2013, Walker saw Danielle Pyevich, M.D. for a follow-up visit on depression. AR 600-01. At this visit, she reported a worsening of previously treated symptoms; she had been off her medications for several months because she did not go to a follow-up appointment at Sausal Creek as instructed. AR 600. She presented with multiple symptoms including anxious/tearful thoughts, a depressed mood, and auditory hallucination, i.e., hearing negative voices sometimes from the television. *Id.* She indicated that her depression was

17

aggravated by stressors such as financial stress, the pending SSI application, and social isolation. AR 600.  Walker also stated that her symptoms of depression and psychosis "were much improved" when she was compliant with her medications.  *Id*.  She denied alcohol and cocaine use for several years, and reported that she saw Sussman for weekly counseling and planned to start going to group counseling at Friendly Manor.  *Id*.  Upon a mental status examination, Pyevich observed that Walker had a constricted and tearful affect at times, was anxious and depressed in mood, and had auditory hallucinations, but demonstrated otherwise normal findings.  *Id*.  She diagnosed Walker with Axis I and II: Major Depression, Recurrent (296.30), Cocaine Dependence, Unspecified (304.20), Alcohol Dependence (303.90); Axis IV: Moderate, problems related to primary support group and social environment; and Axis V: GAF score of 48.  She restarted Walker on Prozac and Risperdal, and provided her with psychoeducation regarding her medications and compliance with them, among other things.  *Id*.

Walker saw Pyevich again on November 27, 2013 for a follow-up visit.  AR 597-99.  She reported that she continued to feel depressed and occasionally heard voices from the television, but the voices were less clear and less frequent.  *Id*.  She denied use of alcohol and cocaine for several years.  *Id*.  She stated that she attended AA meetings several times per week, and saw Sussman for weekly counseling.  *Id*.  Upon a mental status examination, Pyevich observed that Walker's mood was depressed, her affect constricted, and that she had auditory hallucinations, but demonstrated otherwise normal findings.  *Id*.  Her diagnoses were the same as the prior visit, except for a higher GAF score of 50 at this visit.  *Id*.  Pyevich continued Walker on her medications and ordered a follow-up visit with the primary care physician and annual labwork.  *Id*.

On January 10, 2014, she saw Pyevich again for a follow-up visit.  AR 594-96.  At this visit, she reported ongoing symptoms of intermittent depression and occasionally hearing voices from the television, but the voices were less frequent.  AR 594.  She admitted to drinking a "few beers" over the holiday, but denied any cocaine use in several years.  *Id*.  She stated that she was still attending the 12 step meetings sporadically and continued to see Sussman for weekly counseling.  *Id*.  She reported that she was not fully compliant with her medications, and missed several doses per week because she forgot.  *Id*.  She also stated that she had a history of a positive

18

1   response with the current medication regime when she was fully compliant. AR 594. Upon a

2   mental status examination, Pyevich observed that Walker's mood was depressed and occasionally

3   tearful and her affect was constricted, but she demonstrated otherwise normal findings. *Id*. She

4   diagnosed Walker with Axis I and II: Major Depression, Recurrent (296.30), Cocaine

5   Dependence, Unspecified (304.20), Alcohol Dependence (303.90); Axis IV: Moderate, problems

6   related to finances, occupation, primary support group and social environment; and Axis V: GAF

7   score of 48. Pyevich continued Walker on Prozac and Risperdal, and ordered her to complete the

8   annual lab work prior to the next appointment. AR 596.

9       On March 17, 2014, Walker completed the lab work ordered by Frey on September 26,

10  2013. AR 610-13. The March 2014 sample tested positive for cocaine. AR 610.

11      Walker presented to Pyevich for a follow-up visit on May 15, 2014. AR 592-93. At this

12  visit, she complained that she was getting worse and reported an increase in depression in the

13  context of running out of medications and an increase in hearing voices from the television. AR

14  592. She stated that she continued to drink alcohol, occasionally swigs of gin. *Id*. Although she

15  initially denied cocaine use since the last visit (January 2014), she admitted that she had used

16  cocaine once at a party when Pyevich reviewed her lab work. *Id*. She indicated that she ran out of

17  her psychiatric medications since the last visit (January 2014) and had a history of positive

18  responses when she was fully compliant with the medication regimen. *Id*. She reported that she

19  stopped going to AA meetings, but restarted them at the advice of her disability lawyer, and

20  continued to see Sussman for weekly counseling. *Id*. Upon a mental status examination, Pyevich

21  observed that Walker's mood was depressed and her affect was constricted, and that she had

22  auditory hallucinations, but demonstrated otherwise normal findings. *Id*. She diagnosed Walker

23  with Axis I and II: Major Depression, Recurrent (296.30), Cocaine Dependence, Unspecified

24  (304.20), Alcohol Dependence (303.90); Axis IV: Moderate, problems related to finances,

25  occupation, primary support group and social environment; and Axis V: GAF score of 48. In her

26  specific plan instructions, Pyevich noted that Walker reported ongoing symptoms of depression

27  and psychosis in the context of "poor medication compliance, ongoing alcohol, cocaine use." AR

28  593. She restarted Walker on Prozac and Rispderal, among other things, recommended sobriety,

19

and strongly recommended a substance abuse treatment program. AR 593.

Walker saw Pyevich a little over a month later on June 26, 2014 for another follow-up visit. AR 590-91. At this visit, she complained of feeling tired all the time, and stated that her mood was fair, but that she still occasionally felt depressed and anxious. AR 590. She denied any recent hallucinations. *Id*. She reported that she drank one beer since the last visit (May 2014), but denied any cocaine use during that time. *Id*. She also reported that she was going to AA meetings about every other week and continued to see Sussman for weekly counseling and a primary care physician at West Oakland Clinic for medications. *Id*. Upon a mental status examination, Pyevich observed that Walker's mood was depressed and her affect was constricted, but that she demonstrated otherwise normal findings. *Id*. She diagnosed Walker with Axis I and II: Major Depression, Recurrent (296.30), Cocaine Dependence, Unspecified (304.20), Alcohol Dependence (303.90); Axis IV: Moderate, problems related to finances, occupation, primary support group and social environment; and Axis V: GAF score of 50. She continued Walker on Prozac and lowered the Risperdal dosage to target symptoms of psychosis and augmented depression, and recommended sobriety, among other things. AR 591.

On September 2, 2014, Walker saw Pyevich for a follow-up visit. AR 588-89. At this visit, she reported that she was OK and that her mood was OK. AR 588. She denied sustained depression, but confirmed intermittent anxiety, depression, and social isolation. *Id*. She stated that she occasionally heard voices, but was extremely vague on the content of those voices. *Id*. She also stated that she had been to a few 12 step meetings since the last visit, and continued to see Sussman for counseling. *Id*. She denied alcohol use or use of illicit substances since the June 2014 visit. *Id*. She reported compliance with her medications, and a fair response overall. *Id*. Upon a mental status examination, Pyevich observed that Walker's mood was anxious, her affect was constricted, and that she had vague auditory hallucinations, but that she demonstrated otherwise normal findings. *Id*. Her diagnoses were the same as the prior June 2014 visit. *Id*. Pyevich continued Walker on Prozac and Risperdal and continued to recommend sobriety and substance abuse treatment. AR 589.

### 9.    Treating Social Worker, Ann Sussman, LCSW - April 2015

On April 20, 2015, Sussman provided an updated clinical overview of Walker.  AR 587. She indicated that she saw Walker weekly since July 2013.  *Id*.  Sussman continued to diagnose Walker as Axis I: Major Depressive Disorder and Axis II: Alcohol Dependence in Remission.  *Id*. She noted that Walker was currently prescribed Prozac for depression and Risperdal for hallucinations, and attended weekly activities at the Friendly Manor outpatient clinic.  *Id*. Sussman also noted that Walker had a history of alcohol dependence, but had always been sober during their sessions.  *Id*.

Regarding Walker's mental health issues, Sussman observed that Walker experienced ongoing insomnia, feelings of worthlessness, loss of energy, concentration difficulties, general disinterest, malaise, and emotional lability and hallucinations, and had few social relationships outside of the clinical setting.  *Id*.  She indicated that Walker was emotionally labile throughout the nearly two years she treated her, and was also tearful at many of their sessions, and "seemed incapable of achieving a sustained state of well being," "despite being treated with psychotropic medications to alleviate her depressive and, at times, psychotic, symptoms."  *Id*.  Sussman opined that although Walker's weekly attendance at their therapy sessions and outpatient activities at Friendly Manor "indicate[d] a true desire to get better . . . [that] in almost two years, significant improvement in her depression [had] not materialized."  *Id*.

Regarding work functionality, Sussman opined that her "ongoing mental and physical challenges would make it almost impossible for her to work in a consistent way."  *Id*.  She noted that Walker would be unable to show up work regularly, and would experience difficulty working in any setting where she had to collaborate and/or take direction from others due to the fact that she was easily irritated.  *Id*.

### 10.    Testifying Medical Expert, Ann Monis, PsyD - September 2015

Monis is a licensed psychologist in Florida.  AR 669-72.  She was called as the medical expert at the September 2015 hearing to testify about Walker's impairments.  At the hearing, Monis opined that Walker did not meet or equal any of the listed impairments due to inconsistent and conflicting medical records about her impairments.  AR 42-44.  Regarding Walker's

functional capacity without substance abuse, Monis found that Walker was moderately restricted in the activities of daily living when she felt depressed; had moderate difficulties in maintaining social functioning; had mild difficulties in maintaining concentration, persistence, and pace; and had no hospitalizations. AR 44-45. Assuming Walker was sober (no cocaine or alcohol use), Monis opined that Walker would be able to work in a limited stress environment that did not involve "extreme concentration" without any limitation on her interactions with the public or co-workers. AR 45-46.

In response to questions from Walker's attorney, Monis testified that she reviewed medical records from Sussman, who treated Walker since July 2013, and found that Sussman's October 2013 assessment was contradicted by records from other providers where Walker denied sustained symptoms of depression and reported an euthymic mood. AR 48-50. She also observed that while it was possible that Walker's moodiness caused conflicting reports about her symptoms, to have conflicting reports during an hour evaluation period would be indicative of rapid cycling bipolar disorder, which was not documented anywhere in the record. AR 50-51. Monis reiterated her opinion that she could not find that Walker met a listed impairment because the record, as a whole, contradicted itself. AR 51. By way of example, she pointed to (1) test results from the same evaluation which showed Walker achieved a 27 of 30 on a mini-mental status examination, but reported a severe decline in memory, AR 51; (2) conflicting reports of alcohol and cocaine use within a relatively short period of time; *id*.; and (3) ongoing GAF scores that indicated that she was severe, but the narrative portions also stated that she was "feeling fine." AR 51-52. She also testified that she found contradictions between the psychological evaluations performed by Lebeck and Wiebe. AR 54. According to Monis, Lebeck diagnosed Walker with paranoid schizophrenia, whereas Wiebe diagnosed her with schizo-affective depressive disorder. Both Lebeck's and Wiebe's diagnoses had different diagnosing criteria, despite some overlapping symptoms. AR 55. Monis also found that while Walker's psychologist found her to be credible/not malingering, the mental health records contradicted themselves. AR 56. Monis opined that she could not offer an opinion on the materiality of Walker's DAA until there were evaluations indicating how severe her DAA use was. AR 56-57.

**C.      VE's Testimony**

At the hearing, the ALJ posed a hypothetical to the VE to determine what unskilled jobs at a light or medium exertional level an individual with Walker's restrictions could perform.  He noted that Walker did not have any past relevant work and posed the following hypothetical: an individual of Walker's age and education with no work history, who is limited to performing work at the medium exertional level with simple, repetitive tasks; who can occasionally interact with the public and coworkers; who cannot be subject to strict pace or daily production quotas; and who should avoid concentrated exposure to smoke, dust, chemical fumes, and similar irritants.  AR 65. The VE testified that an individual with such restrictions would be able to perform three jobs in the national economy at a medium exertional level: 1) packaging field (a hand packager), DOT code 920.587-18, unskilled work, and a SVP[7] of 2; 2) dishwasher, DOT code 318.687-010, unskilled work, and a SVP of 2; and 3) order filler/picker, DOT code 922.687-058, unskilled work, and a SVP of 2.  AR 65-66.  Regarding the light exertional level, the VE testified that an individual with such restrictions would be able to perform two jobs in the national economy: 1) blueprint trimmer, DOT 920.687-038, and a SVP of 2; and 2) advertising material distributor, DOT 230.687.-010 and a SVP of 2.  AR 70.

Regarding the packaging field (hand packager) job, the VE testified that he eroded the number of jobs nationally by 80 percent to account for the variables in the ALJ's hypothetical, which resulted in 105,000 jobs nationally and 14,000 locally.  AR 66.  Regarding the dishwasher job, the VE eroded the national jobs figure by 50 percent, which resulted in 50,000 jobs nationally and 13,000 locally.  *Id.*  Regarding the order filler/picker job, the VE eroded the national jobs figure by 80 percent, which resulted in 63,000 jobs nationally and 1,600 locally.  AR 66.  To

---

[7] "'SVP' refers to the 'specific vocational preparation' level which is defined in the DOT as 'the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1230, n.4 (9th Cir. 2009) (quoting *Dictionary of Occupational Titles*, Appendix C, p.1009 (4th ed. 1991)). "'The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 C.F.R. 404.1568 and 416.968, unskilled work corresponds to an SVP of 1–2; semi-skilled work corresponds to an SVP of 3–4; and skilled work corresponds to an SVP of 5–9 in the DOT.'" *Bray*, 554 F.3d at 1230, n.4 (quoting *Policy Interpretation Ruling: Titles II & Xvi: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions*, SSR 00-4P (S.S.A. Dec. 4, 2000)).

1    account for the light exertional level, the VE eroded the national jobs figure for the order

2    filler/warehousing field position by 90 percent, which resulted in 31,000 jobs nationally and 800

3    locally.  AR 70.

4          Walker's attorney posed two hypotheticals to the VE.  He first asked the VE to assume all

5    the elements of the ALJ's hypothetical with the following addition: the individual would be off

6    task 10 percent of the time.  AR 67.  The VE testified that such a restriction would not have a

7    major effect on the individual's ability to perform the three jobs he identified and might erode the

8    national job figures for packaging positions by 90 percent as opposed to 80 percent.  AR 67.

9    Walker's attorney then asked the VE to assume all the elements of the prior hypothetical with the

10    following addition: the individual had inappropriate interactions with the public, co-workers, or

11    supervisors, once a week.  AR 68.  The VE testified that if inappropriate interactions occurred

12    weekly, that such an individual would be "terminated pretty quickly."  AR 68.

13        **D.    2015 ALJ's Decision**

14          At the outset, the ALJ noted that the October 24, 2011 decision prevented Walker from

15    asserting that she was disabled through the date of that decision, and also created an ongoing

16    presumption that she was able to work beyond that date.  AR 17.  In order to rebut the

17    presumption and obtain a disability award under the current disability application, the ALJ

18    observed that Walker must demonstrate a "changed circumstance" affecting the issue of disability

19    with respect to the period of October 24, 2011 to the present such as a change in her age category,

20    an increase in the severity of her impairment, the existence of a new impairment, or a change in

21    the criteria for determining disability.  *Id*.  Based on a review of the entire record, the ALJ found

22    that there were changed circumstances affecting the issue of disability for the period of October

23    24, 2011 forward, namely additional medical evidence and medically determined impairments,

24    and the fact that Walker changed age categories in July 2013.  AR 18.

25         The ALJ then applied the five-step sequential evaluation process to determine whether

26    Walker was disabled based on the August 2012 application.  In doing so, he found that Walker had

27    the following severe impairments: asthma, "rule out" fibromyalgia, depression, anxiety, and

28    polysubstance use disorder (alcohol and cocaine) in uncertain remission (20 C.F.R. § 416.920(d)).

AR 29. He also found that Walker: 1) was a younger individual as of her application date of August 29, 2012; 2) had at least a high school education and was able to communicate in English; and 3) had no past relevant work. AR 29.

The ALJ determined that Walker's substance use disorder was a contributing factor that was material to the disability determination, and that she would not be disabled if she stopped the substance use. Based on that finding, he concluded that Walker retained the following residual functional capacity (RFC) if she stopped substance use: Walker could perform light work as defined in 20 C.F.R. § 416.967(b),[8] except that she could push and pull devices up to 20 pounds; stand and walk 6 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; frequently stoop, bend, kneel, crouch, and climb; must avoid concentrated exposure to smoke, dust, chemical fumes, and similar irritants; was limited to simple, repetitive tasks; and could occasionally interact with coworkers and the public. AR 22. He also found that there were jobs that Walker could perform with such an RFC. AR 29. In so finding, the ALJ relied on the opinion of the VE, who testified that an individual with such an RFC could perform other jobs existing in significant numbers in the national economy, including blueprint trimmer and advertising material distributor. AR 30.

## IV. ISSUES PRESENTED

Walker challenges the ALJ's decision on several grounds. She contends that the ALJ erred in weighing the medical opinions; erred at Step Three; and erred in assessing Walker's credibility. She also argues that the ALJ improperly assessed the materiality of DAA to her disability.

The Commissioner cross-moves to affirm, arguing that the ALJ's decision is supported by substantial evidence and is free of legal error.

---

[8] Light work" is work which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," and "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b). "To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." *Id.*

25

# V.    DISCUSSION

## A.    The ALJ's Evaluation of the Medical Evidence

Walker argues that the ALJ erred in weighing the medical evidence when he assigned great weight to the opinions of testifying medical expert Monis and non-examining state consultant Lee, and no weight to the opinions of examining psychologists Wiebe and Lebeck and treating social worker Sussman.

### 1.    Legal Standards

Courts employ a hierarchy of deference to medical opinions based on the relation of the doctor to the patient. Namely, courts distinguish between three types of physicians: those who treat the claimant ("treating physicians") and two categories of "nontreating physicians," those who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("non-examining physicians"). *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a non-examining physician's opinion. *Id*.

The Social Security Act tasks the ALJ with determining credibility of medical testimony and resolving conflicting evidence and ambiguities. *Reddick*, 157 F.3d at 722. A treating physician's opinion, while entitled to more weight, is not necessarily conclusive. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). To reject the opinion of an uncontradicted treating physician, an ALJ must provide "clear and convincing reasons." *Lester*, 81 F.3d at 830; *see, e.g.*, *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (affirming rejection of examining psychologist's functional assessment which conflicted with his own written report and test results); *see also* 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). If another doctor contradicts a treating physician, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount the treating physician's opinion. *Lester*, 81 F.3d at 830. The ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citation omitted). "[B]road and vague" reasons do not suffice.

*McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989).  This same standard applies to the rejection of an examining physician's opinion as well.  *Lester*, 81 F.3d at 830-31.  A non-examining physician's opinion alone cannot constitute substantial evidence to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984), though a non-examining physician's opinion may be persuasive when supported by other factors.  *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (noting that opinion by "non-examining medical expert . . . may constitute substantial evidence when it is consistent with other independent evidence in the record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from claimant).  An ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa*, 143 F.3d at 1244.  An opinion that is more consistent with the record as a whole generally carries more persuasiveness.  *See* 20 C.F.R. § 416.927(c)(4).

### 2. Analysis

#### a. Monis and Lee

At the hearing, Monis opined that Walker did not meet or equal any of the listed impairments due to inconsistent and conflicting medical records about her impairments.  AR 42-44, 48-55.  She also opined that, in the absence of substance abuse, Walker was moderately restricted in the activities of daily living; had moderate difficulties in maintaining social functioning; and had mild difficulties in maintaining concentration, persistence, and pace.  AR 44-45.  Monis further opined that in the absence of substance abuse (cocaine or alcohol use), Walker would be able to work in a limited stress environment that did not involve "extreme concentration," but without any limitation on her interactions with the public or co-workers.  AR 45-46.

Lee, a non-examining state consultant, reviewed Walker's medical records and completed an MRFCA.  AR 163-65.  He opined that Walker was not significantly limited in understanding and in her memory-like abilities, *see* AR 164, could sustain concentration and persistence limitations for simple tasks, *see* AR 164, could adapt to changes in routine work settings, *see* AR

165, but should have limited public/peer/supervisor contact. AR 164-65. He also concurred with the DAA materiality finding of Jalega (DEA III). AR 157, 165. Jalega observed that Walker had improved with treatment and would "likely continue to improve should she refrain from cocaine/ETOH" and follow treatment. AR 165. Jalega opined that DAA was material, and that without DAA, Walker was "likely capable of simple tasks w/limited public contact." *Id*.

The ALJ assigned great weight to Monis's opinion because it was "relatively consistent with that of Dr. Lee," who opined that Walker was capable of performing simple repetitive tasks with limited public contact. AR 27. He assigned great weight to Lee's opinion because "his limitations [were] well supported by the longitudinal medical record," which showed that Walker's "mood and hallucinations improve[d] with medication compliance and abstinence from cocaine and alcohol." *Id*.

Walker contends that the ALJ did not provide specific and legitimate reasons for assigning Monis's opinion great weight. She argues that the ALJ failed to explain how Monis's opinion was consistent with Lee's opinion or any other reason why Monis's opinions should be credited over other treating and examining sources.

The Commissioner contends that the ALJ properly relied on Monis's and Lee's opinions. She argues that Monis discussed the inconsistencies in the record at the hearing and explained the reasoning behind her conclusions, which warrant the weight given by the ALJ. As for Lee, the Commissioner's argument is less clear. The Commissioner appears to argue that Lee's opinion is consistent with the "longitudinal medical evidence," but only points to Lee's "summation or endorsement of [the] medical review of the record." Def.'s Opp'n at 11:12-16.

"In order to discount the opinion of an examining physician in favor of the opinion of a nonexamining medical advisor, the ALJ must set forth specific, legitimate reasons that are supported by substantial evidence in the record." *Nguyen v. Chater*, 100 F.3d 1462, 1466 (9th Cir. 1996); *Coelho v. Astrue*, No. C 10-02102 JSW, 2011 WL 3501734, at *7 (N.D. Cal. Aug. 10, 2011), *aff'd sub nom. Coelho v. Colvin*, 525 F. App'x 637 (9th Cir. 2013) (same). For example, the ALJ may be entitled to give "great weight to a nonexamining physician" "when the physician's opinion is consistent with the record." *Binford v. Berryhill*, No. 3:17-CV-05805-

DWC, 2018 WL 3629312, at *6 (W.D. Wash. July 31, 2018). However, the ALJ cannot rely on the "opinion of a nonexamining physician . . . by itself [as] substantial evidence [to justify] the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 830.

Having carefully reviewed the record, the court finds that the ALJ failed to provide specific and legitimate reasons for assigning great weight to Monis's and Lee's opinions. The sole reason he gave for assigning great weight to Monis's opinion was because it was "relatively consistent" with Lee's opinion. AR 27. This is vague and does not qualify as a specific and legitimate reason to assign such weight to Monis's opinion. *See, e.g., McAllister*, 888 F.3d at 602 ("[B]road and vague" reasons do not qualify as "specific and legitimate" reasons to reject a treating or examining physicians's opinions.). The ALJ does not explain how Monis's opinion is consistent with Lee's opinion. In examining both opinions, the only fact that stands out as consistent or similar between the two is that they both generally attest that Walker has work functionality in the absence of substance use. It is unclear whether there are any other consistencies or similarities between the opinions. In fact, it appears that the opinions are dissimilar in material aspects. For example, Monis opined that Walker could work in a "limited stress environment" that did not involve "extreme concentration," and could also work around peers, co-workers, and the public, AR 45-46, whereas Lee limited Walker to simple tasks, and further restricted her contact with the public, peers, and supervisors. AR 164-65. Without further explanation for the ALJ's emphasis on the unspecified consistency between the two opinions, it is also unclear whether the consistency is probative of the issue of disability. *See Leonard v. Comm'r of Soc. Sec.*, No. 3:16-CV-00079-JD, 2017 WL 3575593, at *2 (N.D. Cal. Mar. 31, 2017) (The ALJ erred in rejecting the opinion of treating and examining physicians where the ALJ "provided no examples of how [the nonexamining physician] is consistent with the record" and did not "identify any independent clinical findings [the nonexamining physician] may have relied on" and instead only "summarized [the nonexamining physician's] conclusions.").

To the extent that the ALJ's assignment of great weight to Monis's opinion is based on Lee's opinion, it is built on a shaky foundation. Lee, a non-examining state consultant, adopted

the conclusory opinion of Jalega, another non-examining state consultant, regarding DAA materiality. AR 157, 165. Jalega stated that recent exams noted that Walker remained in remission from cocaine and alcohol, was compliant with medications, and noted improvement in mood and decrease of auditory hallucinations. However, Jalega does not identify these exams, nor can the court locate any in the record that contain those findings. At most, the record shows some improvement in auditory hallucinations and depression with medication compliance.

As the Ninth Circuit has explained, "[c]ycles of improvement and debilitating symptoms are a common occurrence [with mental health issues], and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) (citing *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001)); *Holohan*, 246 F.3d at 1205 ("[The treating psychiatrist] statements must be read in context of the overall diagnostic picture he draws. That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace."); *Ghanim v. Colvin*, 763 F.3d 1154, 1161-62 (9th Cir. 2014) (ALJ erred in rejecting the opinions of treating physicians based on treatment notes showing "some improved mood and energy level;" the treatment notes must read in the "'context of the overall diagnostic picture'" and "consistently reflect[ed] that [the plaintiff] continued to experience severe symptoms, including ongoing depression and auditory hallucinations, difficulty sleeping, nightmares, and memory loss") (quoting *Holohan*, 246 F.3d at 1205).

Here, the record as a whole demonstrates that Walker has a history of chronic mental health issues including depression and auditory hallucinations since at least 2010. The period of improvement shows an abatement of auditory hallucinations with medication (less frequency, more distant, and less pronounced), but not necessarily an increase in work functionality or employability. *See, e.g.*, AR 532 (2/15/12 visit to Lifelong: reporting that Risperdal was helpful in "making the voices less loud"); 528 (4/30/12 visit to Lifelong: taking Risperdal and reporting that she still heard voices, but the voices were more distant); 526 (7/18/12 visit to Lifelong: needing a

medication refill and reporting that she still heard voices, but the voices were distant and did not bother her); 523 (4/3/13 visit to Lifelong: taking Risperdal and reporting auditory hallucinations, but the voices were not as loud as when she did not take her medications); 522 (4/1/13 visit to Lifelong: taking Risperdal and reporting auditory hallucinations, but the voices were not as loud and further away compared with the prior visit); 600 (10/17/13 visit to Lifelong: reporting that she had been off medications for several months and a worsening of previously treated symptoms including auditory hallucination; indicating that her depression and psychosis were "much improved when" with medication compliance); 597 (11/27/13 visit to Lifelong: taking Risperdal and reporting occasionally hearing voices from the television, but the voices were less and less frequent); 594 (1/10/14 visit with Lifelong: taking Risperdal and reporting occasionally hearing voices from the television, but the voices were less frequent); 590 (6/26/14 visit with Lifelong: taking Risperdal and denying any recent hallucinations); 588 (9/2/14 visit with Lifelong: reporting medication compliance and occasionally hearing voices). The record also shows that Walker's anxiety and depression improved with medication, but did not completely abate. *See, e.g.*, AR 532 (2/15/12 visit to Lifelong: observing that Walker's mood, appetite, and sleep had improved and recommending that she take Prozac in the morning); 522 (4/1/13 visit to Lifelong: Walker reporting a "pretty good/euthymic" mood and decreased anxiety and depression, provider continuing Walker on Prozac); 588 (9/2/14 visit to Lifelong: Walker reporting an OK mood and medication compliance).

The ALJ did not provide enough evidence or reasoning to conclude that Walker can "function effectively in a workplace," based on some improvement. *See Garrison*, 759 F.3d at 1017 (explaining that reports of improvement in the context of mental health issues must be "interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace."); *see also Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011) (citations omitted) ("There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce, and that difference is borne out in [the] treatment notes. Those notes show that although [plaintiff] had improved with treatment, she nevertheless continued to frequently

experience bouts of crying and feelings of paranoia. The ALJ was not permitted to 'cherry-pick' from those mixed results to support a denial of benefits.").

Jalega also opined that Walker had improved and would likely continue to improve should she refrain from cocaine and alcohol, and that DAA was therefore material. AR 165. However, Jalega did not identify any periods of sobriety or abstinence in the record, so the court is unable to determine with any certainty whether this finding is supported by substantial evidence. The record as a whole contains contradictory evidence on sobriety. To the extent that periods of sobriety or abstinence exist, they appear to be spotty and irregular. The record shows that Walker used substances even when she reported sobriety. For example, on July 12, 2013, she reported to Lebeck that she quit using cocaine approximately 4-5 years ago. AR 563. On September 26, 2013, she also reported that it had been 3 years since she used cocaine, but Frey suspected continued cocaine use and ordered a tox screen. AR 604. However, the record shows that on July 29, 2012, Walker reported to Wiebe that she last used cocaine approximately 3 months ago, and, prior to that use, had last used cocaine 2 months before. AR 488, 604. Additionally, at the October 17, 2013 and November 27, 2013 visits with Pyevich, Walker denied alcohol and cocaine use for several years. AR 597 (11/27/13 visit); 600 (10/17/13 visit). However, the record also shows that in 2012, Walker admitted using cocaine on at least two occasions that year, *see* AR 488, 604, and to consuming alcohol at several visits in 2012 and 2013, *see, e.g.*, AR 532 (2/15/12 visit with Lifelong: admitting to having a can of beer twice a week); 488 (7/29/12 exam: admitting to having a glass or two of beer every other day and a glass of wine two days ago); 523 (3/4/13 visit with Lifelong: admitting to drinking 1 can of beer a week); 563 (7/12/13 visit with Lifelong: admitting to occasionally drinking a beer). In short, Jalega does not identify records which support his opinion that Walker experienced improvement during periods of abstinence. Lee relied on Jalega's bare opinion, which renders Lee's opinion similarly unsupported.

In sum, the ALJ erred in assigning great weight to Monis's and Lee's opinions.

### b. Wiebe

Wiebe performed a 3 hour consultative psychological evaluation on Walker on July 29, 2912, and issued a 16-page report detailing her findings and opinions. AR 486-501. Pertinent to

the ALJ's decision, Wiebe opined that Walker had severe impairments in memory functioning; moderate to severe impairments in attention/concentration/persistence; moderate impairment in executive, language, and visual/spatial functioning; and showed mild impairments in sensory-motor functioning. AR 496. She also opined that Walker's psychiatric symptoms interfered with her cognitive functioning and ability to make decisions, resolve problems, and effectively manage her daily affairs, and her social isolation would affect her ability to relate effectively to supervisors, co-workers, and the public in a work environment. AR 497. Wiebe further opined that due to the severity of her psychiatric symptoms, Walker would be unable to sustain simple or complex tasks on a full time basis. *Id.* She also indicated that Walker had no useful ability to perform 5 work-related activities including maintaining attention and concentration for 2 hour segments; performing at a consistent pace without an unreasonable number and length of rest periods; and completing a normal workday and workweek without interruptions from psychologically based symptoms. *Id.*

The ALJ assigned no weight to Wiebe's opinions for 4 reasons: 1) Wiebe failed to mention in her "diagnostic impressions" that she performed the exam during a period of active substance use; 2) the treatment notes "overwhelmingly show[ed] improved functioning with abstinence from substances" and "flatly contradict" Wiebe's conclusion that Walker's reported substance use would not account for her severe symptoms, which were unlikely to abate with sobriety; 3) Wiebe apparently took as fact all the information Walker reported to her, such as a long childhood history, even though she had no basis to know that such information was factual; and 4) Wiebe's report is internally inconsistent regarding Walker's alleged social isolation. AR 27.

Walker argues that the ALJ failed to provide specific and legitimate reasons for rejecting Wiebe's opinions. She contends that the ALJ's proffered reasons are conclusory, not supported by substantial evidence, or not supported by any evidence.

The Commissioner does not address any of these reasons in her brief. Instead, she focuses on an entirely different section of the ALJ's decision in which he discusses and discounts other parts of Wiebe's opinion. In that portion of the decision, the ALJ determined that, in the absence of substance use, Walker would not have an impairment or combination of impairments that met

33

or medically equaled any of the impairments listed in 20 C.F.R § 404, Subpart P, Appendix 1 (20 C.F.R. § 416.920(d)). AR 21. In so concluding, he found that Walker would have moderate difficulties if her substance use ceased, and discounted Wiebe's finding that Walker was socially withdrawn and isolated due to personality disorder, anxiety, depression, and distrustfulness because it was inconsistent with Walker's own November 2012 Function Report, and her friend's third-party report. AR 21-22. Based on the above, the Commissioner argues that the ALJ properly discounted Wiebe's opinions.

Since Wiebe's opinions are contradicted by non-examining medical expert Monis and non-examining state agency consultant Lee, who generally opined that Walker had certain work functionality absent substance use, *see* AR 44-45, 165, the ALJ was required to provide "specific and legitimate reasons" supported by substantial evidence to discount Wiebe's opinions. *See Lester*, 81 F.3d at 830.

Because the Commissioner did not address any of the arguments raised by Walker, she may be deemed to implicitly concede them. *See, e.g., Faison v. Colvin*, 187 F. Supp. 3d 190, 194 (D.D.C. 2016) (Commissioner conceded arguments unchallenged in her opposition) (citing cases); *see also Beattie v. Astrue*, 845 F. Supp. 2d 184, 191 (D.D.C. 2012) (the plaintiff's failure to specifically address the Commissioner's arguments may deem those arguments conceded).

Even if the Commissioner did not concede these arguments, the court finds that the ALJ failed to provide specific and legitimate reasons for assigning no weight to Wiebe's opinions. The reasons the ALJ proffered for rejecting Wiebe's opinions are not supported by substantial evidence.

*First*, the ALJ incorrectly criticizes Wiebe for not including substance use dependence in her diagnosis. While Wiebe did not include a specific diagnosis for substance use dependence, AR 497, she discussed Walker's substance use in her report and explained that Walker's substance use was not material to her other disabling impairments. Wiebe noted that Walker reported using marijuana a few times a month on occasion, having a glass of wine two days ago, and last using cocaine approximately 3 months ago. AR 488. She, however, observed that Walker had continuing and severe psychiatric and personality disorder symptoms, and that "her reported use of

1    substances would not account for the severe ongoing symptoms she [was] experiencing, which

2    [were] unlikely to abate soon regardless of her being clean." AR 488. This observation is

3    consistent with Sussman's April 2015 clinical overview in which she opined that Walker "seemed

4    incapable of achieving a sustained state of well being" "despite being treated with psychotropic

5    medications to alleviate her depressive, and, at times, psychotic, symptoms," and that "significant

6    improvement in her depression [had] not materialized" despite weekly therapy sessions for almost

7    2 years. AR 587.

8        *Second*, there is no evidence to support the ALJ's statement that the treatment notes

9    "overwhelmingly show[ed] improved functioning with abstinence from substances." The ALJ

10   does not identify the treatment notes upon which he relies to support his statement. Nor can this

11   court locate treatment notes that show improvement with abstinence, much less "overwhelmingly"

12   show such improvement. As discussed above, the record contains conflicting evidence on sobriety

13   such that the court is unable to ascertain whether such periods exist. To the extent they do, they

14   appear to be brief, episodic, and limited. Additionally, any improvement demonstrated by the

15   records appears to be the result of her compliance with medication regimens, as opposed to her

16   abstinence from substance use, which is not consistently documented. *See, e.g.*, AR 522, 523,

17   526, 528, 532, 588, 590, 594, 597, 600 (taking Risperdal and reporting a decrease in intensity and

18   frequency of auditory hallucinations); *see also* AR 604 (9/26/13 visit to Lifelong: wanting a refill

19   on psychiatric medications because the voices were getting louder); 592 (5/15/14 visit to Lifelong:

20   reporting an increase in depression and hearing voices from the television in the context of

21   running out of medications).

22       *Third*, to the extent that the ALJ faults Wiebe for accepting Walker's statements about her

23   childhood history at face value, the ALJ's criticism is misplaced or at least immaterial. Nothing in

24   the record contradicts Walker's account of her childhood history.

25       *Fourth*, the report does not contain internally inconsistent statements about Walker's social

26   isolation. Wiebe indicated that Walker spoke with her son and daughter on the phone 2-3 times

27   per week, played bingo once a week and attended psychotherapy appointments, but "[was]

28   otherwise socially isolated." AR 587. This statement is consistent with other observations in the

record about her limited social interactions. *See, e.g.*, AR 523 (3/4/13 visit with Lifelong) (reporting social isolation); 594 (1/10/14 visit with Lifelong) (reporting "spending much time alone in her apt, lying in bed watching tv"); 590 (6/26/14 visit with Lifelong) (reporting "spending much of time in her apt watching soap operas"); 588 (9/2/14 visit with Lifelong) (reporting that she "isolates in her apt, spending much of day watching tv"); AR 587 (Sussman April 2015 Clinical Assessment) (Walker "leaves her room for medical appointments and little else" and "has few social relationships outside of a clinical setting, and has very inconsistent interactions with her children.").[9]

Therefore, the ALJ erred in assigning no weight to Wiebe's opinions.

### c. Lebeck

Lebeck conducted a psychological evaluation of Walker on July 12, 2013. AR 560-70. Pertinent to the ALJ's decision, Lebeck opined that Walker's "psychiatric diagnoses [were] permanent conditions that [had] occurred for more than 36 months and [were] unlikely to change," and that she "[was], and [would] likely continue to be, unable to seek and maintain sustainable employment due to the chronic and severe nature of the symptoms she exhibit[ed]." *Id*. She concluded that Walker met the criteria of an individual with severe and persistent psychological conditions and should be eligible for SSI benefits. *Id*. Lebeck also opined that Walker had no useful ability to function, which was the most severe limitation and indicated an inability to perform a task in a regular work setting, in 7 out of 15 work-related activities including maintaining regular attendance and punctuality; complete a normal workday and workweek without interruptions from psychologically based symptoms; and performing work at a consistent pace without an unreasonable number and length of rest periods. AR 569-70. She also opined that Walker had no useful ability to interact appropriately with the general public; maintain socially appropriate behavior; and travel in unfamiliar places. AR 570. Lebeck further opined

---

[9]To the extent the Commissioner argues that this court should affirm the ALJ's rejection of Wiebe's opinions because Wiebe's finding that Walker was socially withdrawn and isolated was inconsistent with Walker's own function report and a third-party report, the Commissioner mixes apples and oranges. The ALJ clearly set forth the reasons why he assigned Wiebe's opinion no weight on the issue of work functionality and this court's task on appeal is to analyze those stated reasons.

36

that Walker would likely be absent from work more than 4 days per month due to her impairments, and that her impairments remained as severe in the absence of substance use. AR 570.

The ALJ assigned Lebeck's opinion no weight because Walker was not sober during the assessed timeframe. Walker reported to Lebeck in July 2013 that she had quit cocaine 4-5 years prior and occasionally drank a beer, but the record showed that she reported substance use (cocaine and alcohol) use to Wiebe in July 2012 and subsequent toxicology results from 2014 confirmed cocaine use at that time. The ALJ also found Lebeck's statement that Walker sustained sobriety despite drinking occasionally was "illogical, at best" and "call[ed] [her] judgment into question." AR 27.

Walker contends the ALJ's reasons for assigning Lebeck's opinion were not specific and legitimate because they were conclusory. She argues that the ALJ failed to apply the materiality analysis required by SSR 13-2p, and that Lebeck's opinion is the type of opinion SSR 13-2p deems satisfactory on the materiality of substance use in the absence of a period of sobriety. She also contends that Lebeck's opinion is supported by Sussman's and Wiebe's opinions.

The Commissioner argues that the ALJ properly discredited Lebeck's opinions because it is internally inconsistent and inconsistent with other medical evidence in the record.

Since Lebeck's opinions are contradicted by non-examining medical expert Monis and non-examining state agency consultant Lee, who generally opined that Walker had certain work functionality absent substance use, *see* AR 44-45, 165, the ALJ was required to provide "specific and legitimate reasons" supported by substantial evidence to discount Lebeck's opinions. *See Lester*, 81 F.3d at 830.

Having carefully reviewed the record, the court finds that the ALJ provided specific and legitimate reasons for assigning no weight to Lebeck's opinions. Walker either misconstrues or misunderstands the ALJ's primary reason for rejecting Lebeck's opinions. The ALJ rejected Lebeck's opinion because she did not have a basis to opine that Walker's impairments remained severe in the absence of substance use. AR 570. The record shows that despite Walker's statement to Lebeck that she quit using cocaine approximately 4-5 years ago, she admitted to

using cocaine on at least two occasions within the past year (2012).  *See* AR 488 (Wiebe 7/29/12 exam) (reporting that she last used cocaine approximately 3 months ago, and, prior to that use, had last used cocaine 2 months before).  Lebeck's opinions failed to account for Walker's recent cocaine use, and therefore her finding that Walker "sustained sobriety" is, at best questionable, if not incorrect.  Lebeck premised her materiality opinion, in part, on Walker's self-reported period of abstinence from cocaine, and the fact that she was "not currently abusing or dependent upon substances."  AR  563, 570.  Additionally, Lebeck's statement that Walker "sustained sobriety" despite occasionally drinking is illogical.  The term "sobriety" in the full context of this statement refers to abstinence or the absence of substance use.  In response to the question, "Would the patient's impairments remain as severe in *the absence of substance use*?," Lebeck responded: "Yes. The client is not currently abusing or dependent upon substances.  Although she drinks occasionally, she has sustained sobriety and psychotic symptoms persist."  AR 470 (emphasis added).  By definition, someone who abstains from substances (drugs or alcohol) does not use them; accordingly, Walker cannot sustain sobriety or abstinence if she occasionally drinks.  Walker argues that there is nothing inherently contradictory in Lebeck's statement because an individual can have an alcoholic drink one day and none for the days, weeks, or months afterwards and still be sober.  To the extent that Lebeck uses the term "sober" to refer to non-abusive substance use, she may be correct.  However, as discussed above, Lebeck used the term "sober" in response to a question about the "absence of substance use," not "substance abuse."  Accordingly, the term "sober," in this context," appears to refer to abstinence, or the "absence of substance use."

Therefore, the ALJ did not err in assigning no weight to Lebeck's opinions.

//

//

//

//

//

//

//

38

### d.     Sussman[10]

Sussman is a licensed clinical social worker who saw Walker for weekly therapy sessions from July 2013 to April 2015.  AR 527-86 (October 2013 MRFC); 587 (April 2015 Clinical Assessment).

On October 15, 2013, Sussman completed a MRFC questionnaire in which she diagnosed Walker with Major Depressive Disorder (Axis I: 296.30) and Alcohol Dependence in Remission (Axis II: 303.93).  AR 582.  She opined that Walker was unable to meet competitive standards/could not satisfactorily perform a number of work-related activities including, but not limited to, maintaining attention for a two-hour segment; performing at a consistent pace without an unreasonable number and length of rest periods; understanding and remembering detailed instructions; carrying out detailed instructions; and maintaining socially appropriate behavior.  AR 584-85.  She also opined that Walker was not a malingerer and her impairments would remain as severe in the absence of substance use, noting that she was depressed even when she was sober, and that Walker had always been sober at their sessions.  AR 585.

On April 20, 2015, Sussman provided an updated clinical assessment.  AR 587.  She noted that Walker had a history of alcohol dependence, but had always been sober during their sessions.  *Id*.  She observed that Walker "seemed incapable of achieving a sustained state of well being," "despite being treated with psychotropic medications to alleviate her depressive and, at times, psychotic, symptoms."  *Id*.  Sussman also noted that although Walker's weekly attendance at their therapy sessions and outpatient activities at Friendly Manor "indicate[d] a true desire to get better . . . [that] in almost two years, significant improvement in her depression [had] not materialized."  AR 587.  She opined that Walker's "ongoing mental and physical challenges would make it

---

[10] Walker argues that the ALJ erred in assigning no weight to Sussman's October 2013 and April 2015 opinions, but she does not further explain her arguments.  The Commissioner, for her part, does not address Sussman's opinions in her opposition.  Accordingly, the court could deem the issue waived.  *See, e.g., Wilson v. Berryhill*, No. CV 16-11637, 2017 WL 3623717, at *6 (E.D. Mich. Aug. 17, 2017), report and recommendation adopted sub nom. Wilson v. Comm'r of Soc. Sec., No. 16-11637, 2017 WL 3602049 (E.D. Mich. Aug. 22, 2017) (deeming plaintiff's argument waived where she "fail[ed] to point to any evidence in the record to support her point").  But since Walker "raised the issue with sufficient specificity," the court declines to deem it waived and will consider the issue.  *Littman v. Astrue*, No. C 08-04071 JSW, 2009 WL 3415780, at *10 (N.D. Cal. Oct. 21, 2009) (declining to find issue waived where plaintiff "raised the issue with sufficient specificity" even though the plaintiff did not specifically explain her argument).

almost impossible for her to work in a consistent way," and that she would be unable to show up work regularly, and would experience difficulty working in any setting where she had to collaborate and/or take direction from others due to the fact that she was easily irritated. *Id*.

The ALJ observed, at the outset, that Sussman was not an acceptable medical source, but considered her opinions as evidence of the severity of Walker's mental impairment. AR 28. He discounted Sussman's opinions because the treatment record showed that Walker's symptoms improved with medication compliance and sobriety, and her October 2013 assessment was internally inconsistent. AR 28.

Social workers are not considered "acceptable medical sources" under the regulations. *Kelly v. Astrue*, 471 F. App'x 674, 676 (9th Cir. 2012) (citing 20 C.F.R. § 404.1513(a)). Rather, they are "other sources" of evidence, and their opinions are not entitled to the same weight as those of "acceptable medical sources." *Id*. As such, their opinions are reviewed under the same standard used to evaluate lay witness testimony. *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 (9th Cir. 2010). To discount the opinion of a social worker, the ALJ need only provide "reasons germane to each witness for doing so.'" *Kelly*, 471 F. App'x at 676 (quoting *Turner*, 613 F.3d at 1223-24).

Having reviewed the record, the court finds that the ALJ did not provide germane reasons for discounting Sussman's opinions. The treatment records, at best, show some improvement with medication compliance. As discussed above, they do not show improvement with sobriety, because the record does not reveal any sustained periods of sobriety from which such an opinion could be drawn. Indeed, Walker reported substance use in the records the ALJ cites. *See, e.g.*, AR 594-96 (1/10/14 visit) (admitted drinking a few beers over the holidays); 592-93 (5/15/14 visit) (admitting cocaine use and drinking alcohol). Additionally, Sussman's October 2013 assessment is not internally inconsistent. The ALJ assumes that someone who is seriously limited in the ability to adhere to basic standards of neatness and cleanliness cannot be personally well-groomed. The mental evaluation check-box which the ALJ points to is ambiguous. It is unclear whether the "ability to adhere to basic standards of neatness and cleanliness" encompasses personal grooming, or if this relates to the ability to perform a work task. AR 585. Thus, the ALJ's reading of

1    Sussman's report does not convincingly show that Sussman's report is internally inconsistent.

2          Therefore, the ALJ erred in discounting the opinions of Sussman.

3          In sum, the ALJ erred in assigning great weight to the opinions of Monis and Lee,

4    assigning no weight to the opinions of Wiebe, and discounting the opinion of Sussman.  However,

5    the ALJ did not err in assigning no weight to the opinion of Lebeck.

6    **B.      DAA**

7          The ALJ concluded that Walker's substance use (cocaine and alcohol) was a contributing

8    material factor to the disability determination, and found that Walker would not be disabled if she

9    stopped the substance use.  AR 30.

10          Walker argues that the ALJ erred in the DAA determination because he failed to provide

11    sufficient information to explain the materiality determination as required by SSR 13-2p.  To the

12    extent that the ALJ based the materiality determination on treatment notes, Walker asserts that the

13    treatment notes do not show improvement with abstinence.  She also contends that any

14    improvement with medication compliance is irrelevant to the materiality analysis, which assesses

15    whether there is improvement with abstinence from drug and alcohol use.

16          The Commissioner does not address Walker's arguments.  Instead, she argues that there is

17    substantial evidence to support the ALJ's materiality determination because the ALJ properly

18    assigned great weight to the testimony of non-examining medical expert Monis, and non-

19    examining state agency consultant Lee, who both opined that, in the absence of substance use,

20    Walker was able to work in a limited capacity.

21          Having carefully reviewed the record, the court finds that the ALJ has failed to sufficiently

22    explain the basis for the materiality determination.  It is unclear on what evidence and/or

23    testimony the ALJ based that determination.  The ALJ did not reference SSR 13-2p in the

24    decision, and he does not utilize its framework for the analysis of DAA materiality in the decision.

25    Nor did the ALJ clearly set forth the reasons and evidence underlying the DAA material

26    determination.

27          To the extent the ALJ relied on treatment notes purportedly showing "overwhelming"

28    improvement with abstinence, the ALJ's finding is not supported by substantial evidence.  As

41

discussed above, the ALJ did not identify or sufficiently describe the alleged periods of abstinence upon which he bases his determination of materiality. For example, the ALJ did not identify when the period(s) of abstinence occurred, how long the period was, what mental impairments remained once the drug and alcohol symptoms abated, and whether the severity of these impairments increased after the period(s) of abstinence expired. *See* SSR 13–2p(9), 2013 WL 621536, at *12. Absent such information, the court is unable to determine whether such periods actually existed. *See* SSR 13–2p(9), 2013 WL 621536, at *12 (providing that the ALJ may consider periods of abstinence as evidence of DAA materiality in cases involving co-occurring mental disorders, so long as the "claimant is abstinent long enough to allow the acute effects of drugs or alcohol abuse to abate"). Additionally, notwithstanding the lack of information about Walker's sobriety in the ALJ's decision, the record contains such contradictory evidence on sobriety that it does not appear any meaningful periods of sobriety or abstinence existed. *Compare* AR 563 (7/12/13 exam with Lebeck) (reporting quitting cocaine approximately 4-5 years ago) and 604 (9/26/13 visit with Lifelong) (reporting that she last used cocaine 3 years ago) *with* AR 488 (7/29/12 exam with Wiebe) (reporting that she last used cocaine approximately 3 months ago and, prior to that use, she last used cocaine 2 months before). Furthermore, as discussed above, none of the treatment notes in the record showed an improvement in Walker's mental impairments that can be attributed solely, or, at least in large part, to sobriety, much less the "overwhelming" improvement the ALJ observed. *See* SSR 13–2p(7), 2013 WL 621536, at *12 ("If the evidence in the case record does not demonstrate the separate effects of the treatment for DAA and for the co-occurring mental disorders," then the ALJ should find that the DAA is not material.).

To the extent that the ALJ relied on treatment notes showing improvement with medication compliance to support his determination that DAA is material, the ALJ's finding is not supported by substantial evidence. Pursuant to SSR 13-2p(7), DAA is not material "if the record is fully developed and the evidence does not establish that the claimant's co-occurring mental disorder(s) would improve to the point of nondisability in the absence of DAA." *Id*. There are no treatment notes in the record showing that Walker's mental impairments (depression and hallucinations) improved or would likely improve to the point of nondisability in the absence of DAA. The

42

record contains evidence supporting the opposite. In July 2012, consulting examiner Wiebe noted that Walker had "continuing and severe psychiatric and personality disorder symptoms" that were "unlikely to abate soon regardless of her being clean." AR 488. In April 2015, Sussman observed that in nearly two years, there was not significant improvement in her depression despite weekly therapy sessions and a desire to get better. AR 587. Nor does the record demonstrate the "separate effects" of any treatment she received for her mental impairments (medication regimen) and any treatment she received for DAA (therapy), which, if such information existed, could support a DAA materiality finding. SSR 13–2p(9), 2013 WL 621536, at *12.

To the extent that the ALJ relied on treatment records showing that Walker's "symptoms improve[d] with medication compliance *and* sobriety," the ALJ's finding is not supported by substantial evidence. The records to which the ALJ cites contain no evidence of periods of sobriety, and in fact, they show the opposite. AR 28. For example, Exhibit B10F/3 is page 3 from Lebeck's report and states that Walker still heard voices, but the voices were not as loud as in the past since taking Risperdal. AR 562. There is no discussion of sobriety on that page. Earlier in the same report, Lebeck noted that Walker reported a 10-12 history of alcohol and cocaine use beginning after the birth of her children, that she quit using cocaine approximately 4-5 years ago, but occasionally drinks a beer. AR 563. Exhibits B15F/5-9 are progress notes from the January 10, 2014 and May 15, 2014 visits with Pyevich at Lifelong clinic. AR 594-96 (1/10/14 visit); 592-93 (5/15/14 visit). At the January 10, 2014 visit, Walker admitted to drinking a few beers over the holidays, but denied any cocaine use for the past several years. AR 594. However, at the May 15, 2014 visit, she admitted using cocaine recently at a party, and also stated that she continued to drink alcohol. AR 592.

To the extent that the ALJ relied on the testimony of Monis and Lee in finding that DAA is material, the ALJ erred in assigning great weight to their opinions for the reasons discussed above. Importantly, Monis opined that she could not offer an opinion on DAA materiality until there were evaluations indicating how severe Walker's DAA use was. AR 56-57.

In sum, the ALJ erred in failing to sufficiently explain the bases for the DAA materiality determination.

43

**C.      Step Three**

At Step Three, the ALJ found that if Walker stopped substance use, she would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.920(d)).  AR 21.  Walker contends that the ALJ erred at Step Three because he failed to analyze the combined effects of her mental and physical impairments absent DAA.  Since the ALJ's Step Three finding depends on his DAA materiality determination, the court finds that the ALJ erred for the same reasons as discussed above.

Therefore, the ALJ erred at Step Three.

**D.      Credibility**

Walker argues that the ALJ erred in rejecting her credibility.

**1.      Legal Standards**

In general, credibility determinations are the province of the ALJ.  "It is the ALJ's role to resolve evidentiary conflicts.  If there is more than one rational interpretation of the evidence, the ALJ's conclusion must be upheld."  *Allen v. Sec'y of Health & Human Servs.*, 726 F.2d 1470, 1473 (9th Cir. 1984) (citations omitted).  An ALJ is not "required to believe every allegation of disabling pain" or other nonexertional impairment.  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989) (citing 42 U.S.C. § 423(d)(5)(A)).  However, if an ALJ discredits a claimant's subjective symptom testimony, the ALJ must articulate specific reasons for doing so.  *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006).  In evaluating a claimant's credibility, the ALJ cannot rely on general findings, but "must specifically identify what testimony is credible and what evidence undermines the claimant's complaints."  *Id.* at 972 (quotations omitted); *see also Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (ALJ must articulate reasons that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.").  The ALJ may consider "ordinary techniques of credibility evaluation," including the claimant's reputation for truthfulness and inconsistencies in testimony, and may also consider a claimant's daily activities, and "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment."  *Smolen v. Chater*, 80 F.3d 1273, 1284

(9th Cir. 1996).

The determination of whether or not to accept a claimant's testimony regarding subjective symptoms requires a two-step analysis. 20 C.F.R. §§ 404.1529, 416.929; *Smolen*, 80 F.3d at 1281 (citations omitted). First, the ALJ must determine whether or not there is a medically determinable impairment that reasonably could be expected to cause the claimant's symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); *Smolen*, 80 F.3d at 1281-82. Once a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to the severity of symptoms "based solely on a lack of objective medical evidence to fully corroborate the alleged severity of" the symptoms. *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (en banc) (citation omitted). Absent affirmative evidence that the claimant is malingering, the ALJ must provide "specific, clear and convincing" reasons for rejecting the claimant's testimony. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The Ninth Circuit has reaffirmed the "specific, clear and convincing" standard applicable to review of an ALJ's decision to reject a claimant's testimony. *See Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014).

### 2. Analysis

The ALJ found that if Walker stopped substance use, the "medically determinable impairments could reasonably be expected to produce some alleged symptoms," but that Walker's and Mr. Bailey's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent that they are inconsistent" with the RFC. AR 23. The ALJ also found that 1) the lack of clinical abnormalities and Walker's activities of daily life; 2) Walker's failure to comply with prescribed treatment, i.e., medication compliance; 3) her falsehoods regarding her substance use; and 4) her lack of work activity since 1991, also undermined her credibility. AR 28-29.

Walker contends that the ALJ did not provide clear and convincing reasons to reject her credibility because his reasons are internally inconsistent. She points to the following inconsistency in the ALJ's decision: The ALJ initially stated that Walker was credible regarding her symptoms and limitations, including her substance use disorders, but later stated that her

statements "concerning the intensity, persistence, and limiting effects of these symptoms" were not credible. Walker appears to misunderstand the ALJ's decision. While not a model of clarity, the ALJ's statements can be reasonably interpreted as consistent with each other. The ALJ's later statements qualified his earlier statement by identifying the specific types of statements about her symptoms (intensity, persistence, and limiting effects) that he found were not credible, and providing additional reasons why he found that she was not credible.

To the extent that Walker challenges the ALJ's other reasons for discrediting her, i.e., her failure to comply with the prescribed treatment and her falsehoods about substance use, those reasons are based on substantial evidence.

*First*, the Ninth Circuit has stated that "we do not punish the mentally ill for occasionally going off their medication when the record affords compelling reason to view such departures from prescribed treatment as part of claimants' underlying mental afflictions." *Garrison v. Colvin*, 759 F.3d 995, 1018 n.24 (9th Cir. 2014). Here, the record shows that on January 10, 2014, Walker reported that she was not fully compliant with her medications and missed several doses per week because she forgot. AR 594. While there is some suggestion in the record that Walker's memory problems may be linked to her underlying mental impairments, she presents no evidence supporting that possibility. Nor does she specifically make those arguments on appeal. In the absence of such evidence, the court cannot find that the ALJ erred in discrediting Walker's credibility due to her noncompliance with medications.

*Second*, as discussed above, the record is replete with examples of Walker's inconsistent statements about her substance use. AR 28. The ALJ properly considered those inconsistencies in evaluating her testimony. *See Molina v. Astrue*, 674 F.3d 1104, 1112-13 (9th Cir. 2012) ("[T]he ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct[.]").

Therefore, the ALJ did not err in assessing Walker's credibility.

//

//

//

## VI. CONCLUSION

In conclusion, the court grants in parts and denies in part Walker's motion and the Commissioner's cross-motion, and remands for further proceedings consistent with this decision.

**IT IS SO ORDERED.**

Dated: September 11, 2018



Donna M. Ryu
United States Magistrate Judge

Judge Donna M. Ryu

United States District Court
Northern District of California